IN THE MATTER OF CHRISTOPHER L. NORRIS, A MINOR MALE CHILD

No. 8211DC1230

(Filed 6 December 1983)

1. **Parent and Child § 1.5— termination of parental rights—absence of counsel at hearing on child neglect**

   Whether respondents in a proceeding to terminate parental rights were represented by counsel during an earlier hearing in which the child was adjudicated a neglected child was of no importance where the court did not rely on the prior adjudication as grounds for terminating parental rights.

2. **Parent and Child § 1.6— termination of parental rights—technical error not prejudicial**

   Respondents in a proceeding to terminate parental rights were not prejudiced by a technical error in a finding by the trial court as to the date a homemaker observed the child appearing nervous and afraid of his mother.

3. **Parent and Child § 1.6— termination of parental rights—finding of adoptability unnecessary**

   A finding of adoptability is not required in order to terminate parental rights.

**4. Parent and Child § 1.6— termination of parental rights—neglect of child**

There was sufficient evidence that a child did not receive proper care, supervision or discipline from his natural parents and that the parents' home environment was injurious to his welfare to support the court's determination that respondents had neglected their child within the meaning of G.S. 7A-289.32(2) and that their parental rights should be terminated.

**5. Parent and Child § 1.5— termination of parental rights—standard of neglect**

The standard of neglect to be applied under G.S. 7A-289.32(2) in a proceeding to terminate parental rights is not unconstitutionally vague.

**6. Parent and Child § 1.6— termination of parental rights—failure to pay reasonable portion of cost of care**

The evidence was sufficient to support the trial court's determination that respondent father's parental rights should be terminated because of his failure to pay a reasonable portion of the cost of care for the child within the meaning of G.S. 7A-289.32(4) where it showed that the father was under court order to pay $15.00 per week for support of the child; respondent made only one payment of $30.00 on the date of a review hearing during the six months preceding filing of the petition; and respondent had the financial ability to pay in at least four of the six months preceding the filing of the petition.

APPEAL by respondents from *Greene, K. Edward, Judge.* Judgment entered 27 May 1982 in District Court, HARNETT County. Heard in the Court of Appeals 19 October 1983.

Respondents, parents of four-year-old Christopher Lynn Norris, appeal an order entered pursuant to G.S. 7A-289.32 to terminate parental rights.

The pertinent facts are as follows:

Christopher Lynn Norris was born on 31 January 1978 to respondents, Debbie Hardison Norris and Terry Lynn Norris. On or about July, 1978, when Chris was approximately six months old, he was adjudicated a neglected child and placed in foster care, under the supervision of petitioner, Harnett County Department of Social Services.

On 21 December 1979, custody of Chris was returned to respondents under the supervision of petitioner. In January, 1981, petitioner offered homemaker services to respondents. A homemaker from Social Services visited and observed respondent, Debbie Norris, on several occasions.

On 16 January 1981, the homemaker arrived at around 2:00 p.m. and found Chris in bed, begging to get up. He appeared nerv-

ous and was pinching his lips until they bled. Mrs. Norris screamed at him to stop such behavior. During this visit, the homemaker observed a blue spot on the child's buttocks. There were no fluids in the home and the homemaker bought orange juice, milk and other items for the home.

On her next visit, 21 January 1981, the homemaker arrived at the Norris home at around 10:15 a.m. and found Chris in bed again, begging to get up. His legs, from the knees down, were cold and blue and purple in color. His bedding and clothing were wet. The homemaker showed Mrs. Norris how to use warm water to massage the child's legs and bring back the proper color.

On 22 January, at around 2:15 p.m., the homemaker returned to find the child in bed again, wearing dirty clothing that smelled of urine. Chris was begging his mother for water, but Mrs. Norris told him that he could not have any and that she was tired of his wetting his pants. Upon the homemaker's request, Mrs. Norris bathed Chris. When Chris was put into the hot soapy water, he began lapping up the water and Mrs. Norris spanked him for such behavior. The homemaker explained that Chris needed liquids, but when she suggested that Mrs. Norris give Chris some orange juice, Mrs. Norris responded that the orange juice belonged to Pam, a younger child.

The homemaker next returned on 25 March 1981, at around 10:00 a.m. and again found Chris in bed. When Chris got up, he fell three times, and his mother made no attempt to help him. Chris was wet and had a cold. Again, the homemaker observed that his legs were purple and blue. When the homemaker suggested that Chris have clean clothes, Mrs. Norris brought wet clothes to the homemaker.

On 26 March 1981, the homemaker and a social worker went to a neighbor's house where Chris had stayed the previous night. Chris had been well cared for at the neighbor's house and his legs were no longer blue and purple.

Although Mrs. Norris showed her younger daughter love and affection, she rejected Chris. She stated that she had really wanted a girl and that girls could be dressed up and loved.

On 30 March 1981, Chris was adjudicated a neglected child and custody was given to petitioner. From 30 March 1981 until

the date of trial, 16 April 1982, Chris had been in foster care. While Chris was in foster care, the Norrises had the right to visit Chris twice each month. The parents did not visit, however, until June, 1981, three months after the child's removal. On 11 February 1982, respondents were served with the Petition for Termination of Parental Rights. Although Mrs. Norris said that she had changed since Chris was removed, she had thereafter quit counseling and had visited Chris only seven times between 26 March 1981 and 11 February 1982, even though a total of twenty-one visits had been available.

At the hearing on 30 March 1981, Mr. Norris was ordered to pay $15 per week for support of Chris. He did not make any payments until the date of a review hearing on 6 June 1981. He thereafter made payments on 15 June 1981 and on 4 September 1981, the day of the second review hearing. On 11 September 1981, when the third review hearing was held, Mr. Norris had made no further payments. In all, from March, 1981 until the trial in May, 1982, only $60 was contributed in support of Chris.

In 1981, Mr. Norris earned about $4,285.00 as a brick mason. The following summary shows an approximate breakdown of monthly earnings:

| | | |
|---|---|---|
| January 1981 | $ 231.50 | gross |
| February 1981 | 337.50 | gross |
| March 1981 | 429.50 | gross |
| April 1981 | 486.86 | net |
| May 1981 | 321.44 | net |
| June 1981 | 346.66 | net |
| July 1981 | 462.69 | net |
| August 1981 | 345.50 | gross |
| September 1981 | 376.50 | gross |
| October 1981 | 485.75 | gross |
| November 1981 | 380.00 | gross |
| December 1981 | 81.00 | |
| | $4,284.90 | |

In addition to his work income, the Norrises received food stamps of $52 to $183 per month and AFDC of about $152 per month. Mr. Norris stated that he could not make support payments because he was burdened by other expenses. Other ex-

penses included rent of $150 per month, an electric bill of $60 per month, car expenses of $25 per week, a heat bill of $25 per week (during winter), and certain other grocery expenses. Easing these financial burdens were several factors: First, respondents rented from their grandparents, who stated that respondents would not be evicted if they missed some rent payments. Second, Mr. Norris' employer would have loaned him money to meet his support obligation had he been asked. Third, on 9 September 1981, Mr. Norris had agreed to notify the county of any difficulty in meeting his obligation; he never did so.

In foster care, Chris changed from a nervous child to an adjusted, happy child. His nervous lip-biting condition disappeared apart from his natural parents. Petitioner, as part of its permanency planning program, identified Chris as a child who could benefit from a stable home environment and as a highly adoptable child, being only four years old and well-adjusted.

Based on these facts, the trial court concluded as a matter of law that respondents had neglected their child pursuant to G.S. 7A-289.32(2) and that Mr. Norris had failed to pay a reasonable portion of child care for a continuous period of six months preceding the filing of the petition, pursuant to G.S. 7A-289.32(4). The Court concluded that terminating parental rights under G.S. 7A-289.31 was in the best interests of the child. Custody was given to petitioner, with authorization to immediately place the child in the home of prospective adoptive parents.

*Bain and Capps, by Elaine F. Capps, for appellants respondents.*

*Woodall, McCormick and Felmet, P.A., by Edward H. McCormick, for petitioner appellee.*

VAUGHN, Chief Judge.

Pursuant to G.S. 7A-289.30(e), findings of fact by the Court in a hearing on termination of parental rights must be based on clear, cogent and convincing evidence. Respondents contend that the evidence presented did not meet this standard. We disagree.

We have already summarized at length the trial court findings and other facts from the Record. Upon review of the testimony at trial and the Record, we conclude that such findings

were based on clear, cogent and convincing evidence. We deal separately with each of respondents' exceptions to the trial court findings.

[1] First, respondents contend that the trial court's finding regarding a 1979 hearing wherein Christopher was adjudicated a neglected child was based on incompetent evidence since respondents were not represented by counsel during such hearing. This contention, though asserted in respondents' brief is not supported anywhere in the Record. Matters discussed in the brief outside the Record are not properly considered on appeal since the Record imports verity and binds the reviewing court. *State v. Hedrick*, 289 N.C. 232, 221 S.E. 2d 350 (1976). In any event, regardless of whether respondents had counsel in 1979, their contention is meritless since the Court had before it plenary evidence and did not rely on the prior adjudication as grounds for terminating parental rights.

[2] In respondents' next Assignment of Error, they contend that the Record is devoid of evidence to support the Court's finding of fact that on 21 January 1981, the homemaker observed Chris appearing nervous and afraid of his mother. A careful review of the Record reveals that the relevant date was not 21 January, but rather, 16 January, that Ms. Thomas described Chris as appearing "real nervous and he'd sit there and he'd clench his lips, he had a habit of clinching his lips, until he broke the skin on his lips."

It is well recognized that technical errors will not authorize a new trial unless it appears that the objecting party was prejudiced thereby, and the burden is on him to show prejudice. *Hines v. Frink and Frink v. Hines*, 257 N.C. 723, 127 S.E. 2d 509 (1962). Respondents have not shown that they were prejudiced by the technical error regarding the date of such observation. We find no reasonable probability that the results of the trial would have been favorable to respondents had such error not occurred. *See Mayberry v. Coach Lines*, 260 N.C. 126, 131 S.E. 2d 671 (1963).

Respondents next challenge the Court's findings of fact in that such findings excluded other relevant evidence. Specifically, respondents point out that Mrs. Norris had neither a driver's license nor a telephone to help arrange visits with her son; that visitation increased following the filing of the petition; and that in 1982, Mr. Norris' income was lower. Pursuant to G.S. 7A-289.30(a),

the trial court, in the instant case, acted as both judge and jury. Our scope of review, when the Court plays such a dual role, is to determine whether there was competent evidence to support its findings of fact and whether its conclusions of law were proper in light of such facts. *Hensgen v. Hensgen*, 53 N.C. App. 331, 280 S.E. 2d 766 (1981); *Blanton v. Blanton*, 40 N.C. App. 221, 252 S.E. 2d 530 (1979). We have already found that the Court's findings of fact were supported by clear, cogent and convincing evidence. The findings of fact by the trial court in a nonjury trial have the force and effect of a jury verdict and are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings. *Hensgen v. Hensgen, supra; see Taylor v. Jackson Training School*, 5 N.C. App. 188, 167 S.E. 2d 787 (1969).

[3] Respondents next challenge the trial court's finding of fact that Chris was highly adoptable. Respondents urge us to adopt the reasoning from the dissenting opinion in *In re Moore*, 306 N.C. 394, 406, 293 S.E. 2d 127, 134 (Carlton, J. dissenting), *pet. denied*, 306 N.C. 565 (1982), *appeal dismissed*, --- U.S. ---, 103 S.Ct. 776, 74 L.Ed. 2d 987 (1983), wherein Justice Carlton argued that the county should have the burden of proving adoptability before the Court can terminate parental rights. It suffices to say that such a finding is not required in order to terminate parental rights. *See* G.S. 7A-289.32.

The trial court concluded, as a matter of law, that respondents had neglected Chris pursuant to G.S. 7A-289(32)2. Respondents now contend that the trial court had before it insufficient evidence to support this conclusion. Respondents' contention is without merit.

[4] The standard for neglect in termination proceedings is found in G.S. 7A-517(21). Pursuant to such statute, a neglected juvenile is:

> [a] juvenile who does not receive proper care, supervision, or discipline from his parent, guardian, custodian or caretaker; who had been abandoned; or who is not provided necessary medical care or other remedial care recognized under State law, or who lives in an environment injurious to his welfare, or who has been placed for care or adoption in violation of the law.

We need not reiterate the evidence adduced at trial showing that Chris did not receive proper care, supervision or discipline from his natural parents and that the Norris' home environment was injurious to his welfare. There was plenary, competent evidence to support the trial court's decision to terminate parental rights pursuant to G.S. 7A-289.32(2) and G.S. 7A-517(21).

[5] Respondents contend that the standard of neglect to be applied under G.S. 7A-289.32(2) is unconstitutionally vague. Our courts have recently considered this question and found such standard to be constitutional, its meaning clear. *In re Biggers*, 50 N.C. App. 332, 274 S.E. 2d 236, 22 A.L.R. 4th 766 (1981).

[6] The trial court also found, as part of its legal conclusions, that Terry Norris had failed, pursuant to G.S. 7A-289.32(4), to pay a reasonable portion of the cost of care for his child. Respondents challenge this conclusion. The facts, as found by the trial court, showed that although under court order to pay $15 per week, Mr. Norris paid a total of only $60 in child support since Chris was placed in foster care on 1 April 1981 until the filing of the petition on 11 February 1982. Respondent contends that he was financially unable to meet his support obligation. In light of the evidence adduced at trial, we disagree.

A determination of a reasonable portion of child support is based on an interplay of the amount of support necessary to meet the reasonable needs of the child and the relative ability of the parents to provide that amount. *In re Biggers, supra.* The Court determined that $150 per month was necessary to support Chris' reasonable needs. Respondent was under Court order to pay 40% of this amount or $60 per month. Respondent's monthly income, meanwhile, ranged from a high of $486.86 in April, 1981 to a low of $81 in December, 1981. While it would be unreasonable to expect respondent to afford $60 for child support in December, it was not unreasonable for him to contribute this amount during the rest of the year when his monthly income was over $300. Respondent, furthermore, had signed a written agreement on 9 September 1981 to inform the county if he had any difficulty meeting his obligation; he never did so.

Pursuant to G.S. 7A-289.32(4), a Court may terminate parental rights if the parent has failed for a period of six months preceding the filing of the petition to pay a reasonable portion of

the cost of care for the child. The petition in the instant case was filed in February, 1982. There was no evidence at trial as to respondent's income in January, 1982. His income during each of the months of August through November, however, was well over $300. Yet during this time, respondent made only one payment of $30 on 11 September, the date of a review hearing. In light of Chris' reasonable financial needs and respondent's ability to pay in at least four of the six months preceding the filing of the petition, we find no error in the trial court conclusion that respondent failed to pay a reasonable portion of child care costs.

For the reasons stated, the Order is affirmed.

Affirmed.

Judges WELLS and JOHNSON concur.